## Yurechko *v.* Allegheny County, Appellant.

326

Argued September 29, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

reargument refused July 15, 1968.

*Orrin G. Hatch,* with him *Robert S. Grigsby,* and *Pringle, Bredin, Thomson, Rhodes & Grigsby,* for appellant.

*Harvey E. Schauffler, Jr.,* for appellee.

OPINION BY MR. JUSTICE JONES, May 21, 1968:

On August 14, 1959, at 1:30 a.m., Joseph Yurechko was operating his motorcycle along Simpson Hollow Road, Elizabeth Township, Allegheny County. Seated behind him on the rear seat of the motorcycle was Helen Case, a young girl employed as a helper in the Yurechko household. At Simpson Hollow Road and Round Hill Church Road there is a "T" intersection and, at this intersection, Yurechko made a left turn and proceeded along Round Hill Church Road, a county highway. When approximately 350 feet from the in-

tersection and while traveling at about 25 miles per hour, the front wheel of the motorcycle struck a pot hole and upset. As a result of the mishap, Yurechko's right leg was so badly crushed and fractured that it had to be amputated and he sustained other personal injuries. Miss Case was not injured.

On May 22, 1961—one year and nine months after the accident—Yurechko's attorney,—having been retained but shortly before that date—sent to the office of the Solicitor of Allegheny County [County] a letter stating that Yurechko had been "seriously injured about 10:00 p.m., August 14, 1958, when his motorcycle struck an unlighted obstruction left in the Simpson-Hollow Roadway, Elizabeth Township, Pennsylvania, by Allegheny County employees."[1] This letter constituted the only formal attempt to notify the County of the happening of this accident aside from the filing of a complaint on February 25, 1962, when Yurechko instituted this action against the County in the Court of Common Pleas of Allegheny County 30 months after the accident. The County filed an answer raising, as an affirmative defense (under the Act of July 1, 1937, P. L. 2547, §1, 53 P.S. §5301) Yurechko's failure to file notice of his claim in the office of the clerk or secretary of the County within six months from the date of origin of his claim and Yurechko's failure to obtain leave of court to file an action upon a showing of a "reasonable excuse" for failure to file such notice. At the outset of the trial, the court ruled that "the [County] may raise this question of notice as an affirmative defense, that [it] may introduce testimony and the issue as to whether or not proper notice was given to the [County] will be left for determination by

---

[1] This letter erroneously set forth the basic facts. The time, place, locale and manner of happening of the accident were all wrong.

the jury." The jury returned a verdict in favor of Yurechko and against the County in the amount of $35,000 and, after entry of judgment thereon, the County filed this appeal. The County seeks the entry of judgment n.o.v. or, in the alternative, a new trial.

The Act of 1937, supra, pertinently provides: "Notice of claim for negligence against municipality. Hereafter any person, . . . claiming damages from any county, . . ., arising from the negligence of such municipality or any employe thereof, shall, within six (6) months from the date of origin of such claim or within six (6) months from the date of the negligence complained of, file in the office of the clerk or secretary of such municipality a notice in writing of such claim, stating briefly the facts upon which the claim is based. Such notice shall be signed by the person or persons claiming damages or their representatives. No cause of action may be validly entered of record where there was a failure to file such notice within the time required by this act, except leave of court to enter such action upon a showing of a reasonable excuse for such failure to file said notice shall first have been secured."

An allegation that a claimant has failed to meet the statutory requirement of notice must be. set forth as an affirmative defense under new matter in an answer to the complaint.[2] The claimant may, *but need not,* petition the court for allowance to proceed by filing a complaint, and by doing so put the issue of "reasonable excuse" directly before the trial court before the proceedings go further. But, as in this case, where the defense does not relate either to the jurisdiction of the court or to formal defects in the complaint, it cannot be raised by preliminary objections but must be

---

[2] *Zack v. Saxonburg Borough,* 386 Pa. 463, 473, 474, 126 A. 2d 753 (1956).

contained in new matter in the answer. This defense bars the recovery, not the right to bring suit: *Zack v. Saxonburg Borough*, 386 Pa. 463, 126 A. 2d 753 (1956); *Housley v. City of Philadelphia*, 107 F. Supp. 141 (E.D. Penna.) (1952).

However, no matter what procedure is followed, the language of the Act requires that claimant at this stage of the proceedings secure leave of court to proceed "upon a showing of a reasonable excuse for such failure to file said notice." If the action is first started and such leave is thereafter secured, then the action may be validated back to the date of entry of the action. As has been said in *Housley v. City of Philadelphia*, supra, at pp. 144, 145: ". . . when a suit is instituted before notice has been given a certain amount of life is breathed into the action, which life remains until it later is determined by the court in the proper exercise of its discretion whether life should remain in the suit to the end or whether the uncertain life of the suit should be terminated. Although the statute says that no action may be 'validly entered' unless permission 'shall first have been secured' under the Pennsylvania decisions, an action may be entered and later validated by the court, and when it is validated the validation relates back to the date of entry of the action."

Once this matter is at issue, it is mandatory upon the trial court to make an independent determination whether there exists a "reasonable excuse for failure to file . . . notice. . . ." A clear reading of the Act allows no other conclusion, and where the legislature has imposed this duty upon the trial court then, although there are both questions of fact and law involved, they cannot be left for determination by the jury. But, while we find it necessary to dispel any confusion regarding the language of the Act of 1937,

supra, in this regard, we do not think that the fact that the trial court in this case allowed the jury to make the determination necessitates a new trial. Considering the record below, it is apparent, as a matter of law, that the trial court, had it made an independent determination could have arrived at no other conclusion but that the County suffered no undue hardship as a result of Yurechko's failure to file notice and that Yurechko had shown "reasonable excuse" as required by the Act of 1937. The tardiness of Yurechko did not work a hardship upon the County. Prior cases construing this provision of "reasonable excuse" have developed two basic elements: (1) negligence of counsel in failing to give the required notice coupled with (2) a determination that the want of notice was not unduly harmful to the defendant: *McBride v. Rome Township,* 347 Pa. 228, 32 A. 2d 212 (1943); *Eisenhauer v. Cleveland Township,* 154 Superior Ct. 206, 35 A. 2d 570 (1944). In *Housley v. City of Philadelphia,* supra, at p. 143, the United States District Court for the Eastern District of Pennsylvania, went further when it said, "Therefore, the excuse for not giving the notice in the proper time in the present case is the ignorance of the plaintiff himself. Certainly if ignorance of counsel is a reasonable excuse for the failure to give the required notice, ignorance of a layman plaintiff is also a reasonable excuse, unless the defendant has been prejudiced or harmed by the failure to give notice." Where the ignorance of a claimant or the negligence of his counsel is coupled with a determination that no undue hardship resulted to the municipality from the failure to file a claim within the six month period, then a "reasonable excuse" has been established, and the trier of fact, be it judge or jury, may render its decision based upon the merits of the case.

Since the Act of 1937 is considered an affirmative defense, the burden of proving such defense rested with the County and it was for the County to show that no written notice was filed with the appropriate municipality "clerk" under the Act. However, having so shown, there does not then arise a presumption that, because such notice was not filed, the municipality suffered undue hardship as a result thereof. If the rule were otherwise, then the claimant would be required to show a set of circumstances ordinarily solely within the knowledge of the municipality. As was done in this case, it is a fairly simple matter for a defendant municipality to elicit testimony from a person, such as the municipal "Director of Investigation, Claim and Records Department", or other appropriate official, to show that no written claim was forwarded or referred to that department within the six months period. But having done so, to then require that the claimant show that the failure to file such notice did not put an undue hardship on the municipality would be to require him not only to prove a negative but also to prove facts ordinarily not within the scope of his knowledge.

It has been said "that while the Act of 1937 was intended to protect municipalities from meretricious and dishonest claimants, it did not intend to erect an artificial and insurmountable barrier against honest claimants." : *Zack v. Saxonburg Borough*, 386 Pa. 463, 126 A. 2d 753 (1956). The statute is not a sword provided to municipalities by the legislature whereby they might cut down the rights of *all* tardy litigants, *including* those whose claims are validly based upon negligence of that very municipality *and* whose tardiness has not caused any prejudice. Rather the Act of 1937, supra, serves as a shield by which municipal governments might protect themselves against claims

of those who have tarried so long that they have made it insurmountably difficult for the municipality to conduct a proper investigation into the circumstances of the accident. To avail itself of this defensive shield, the municipality must show not only that the claimant failed to file written notice of his claim within the six months period, but, further, that, as a result of his tardiness, the municipality has been unduly pressed to delve into the circumstances of the case and is unable to discover properly the events and conditions which led to the mishap and has *thus* suffered *undue hardship*. Having done so, the municipality will have shown that it was in *fact* severely prejudiced by the delinquency of the claimant, and, even though such delinquency was founded upon ignorance of the Act of 1937 or negligence of counsel in filing notice of a claim with the proper authorities, the resultant prejudice will bar claimant's recovery. If no harm or prejudice has befallen the municipality as a result of a claimant's tardiness, then such tardiness is based upon a "reasonable excuse".

Such application of the law is more salutary than that which the County herein proposes whereunder the claimant necessarily would have to overcome an inferred presumption that undue hardship arose because he failed to file written notice of his claim with the appropriate "clerk" within the required period.

A novel proposition advanced by the County in this case concerns the size of the municipality involved. The County in its brief states: "Although the Act of 1937 has been liberally construed, this case must be distinguished from the liberal construction applied in other cases to relax the legislative rule, because in every one of those cases, the claimant sought recovery against a borough or other small municipality and some actual notice had been given to some responsible

official so that the respective municipalities were not prejudiced. Here, recovery is sought against the second largest county in the Commonwealth as a result of an isolated motorcycle accident which admittedly occurred in one of the County's most removed and isolated areas . . ." We are not particularly concerned with the size of the municipality involved, nor are we constrained to look upon the municipalities dealt with in other reported cases as "borough(s) or other small municipalit(ies)." *Housley v. City of Philadelphia,* supra, *Allshouse v. City of Pittsburgh,* 37 Pa. D. & C. 2d 27 (1965) and *Kennedy v. City of Scranton,* 44 Pa. D. & C. 652 (1942), teach that courts are not inclined to construe the Act more liberally when dealing with "boroughs and other small municipalities". Moreover, the County would lessen the importance of the accident here involved by placing it "in one of the County's most removed and isolated areas". The remote location of the road in question is a two-way sword for it is just as reasonable to assume that the County would neglect to properly maintain this remotely located road as it is to assume that the County is prejudiced simply because the accident happened in a remote section and no actual written notice was received within the six months period. The residents of this remote section of the County do not have any less right to come into a court of law simply because they reside in the hinterland of the County, nor does the County's duty to maintain its roads decrease in proportion to the distance from the more populated and less isolated areas of the County.

One of the County's witnesses, the caretaker of Round Hill Road at the time of the accident, testified "if there were any holes there at the time of the accident, that day of the accident, they would be filled in the morning." Of what avail would it be to the County

to send an investigator to the scene of the accident six months later if the hole had been filled for that period of time? There would be no hole to be seen and no measurements to take, and it is doubtful if there would be any indication that a hole had ever existed at the accident scene if the above testimony were taken at its face value, for traffic would have erased the newness of the patch by its daily passing. Of further note is the testimony of the investigating police officer of Elizabeth Township who admitted that on his report neither the blank spaces for weather conditions nor road conditions were filled in. If the investigating officer for the township which has police jurisdiction over the area in which the accident happened failed to compile a report complete in all of its essential details, then Yurechko should not be made to suffer thereby. In our view, the jury properly evaluated the above testimony in determining if any undue hardship was placed on the County.

A review of the record in this case fails to reveal in what respect an undue hardship was placed upon the County as a result of Yurechko's delayed notice. In fact, although the Director of Investigation, Claims and Records Department of the County of Allegheny testified in regard to the date and circumstances of Yurechko's tardy formal notice, filed 21 months after the date of the origin of the claim, he went no further. There is not an iota of testimony whether an investigation was then attempted by the proper municipal authorities nor any testimony of any actual insurmountable difficulties that faced the County in delving into the circumstances of this claim. Certainly, this witness, better than any other presented, was the logical person to question regarding these matters, but the record on this point is utterly silent.

A further review of the record indicates that the County had *no* difficulty in locating witnesses to support its case, for it elicited testimony from (1) the director of the County claims . . . Department, (2) the then caretaker of Round Hill Church Road, (3) the insurance investigator for the company carrying liability insurance for the defendant, (4) several persons who were on the accident scene soon after the motorcycle upset, including the investigating police officer and the driver of the ambulance who administered first aid to Yurechko and then drove him to McKeesport Hospital, (5) one person who testified that from a distance he saw the light of the motorcycle disappear as it went off the road, and (6) the then District Supervisor of Division No. 4 of Allegheny County, responsible for maintenance of the roads in that division. Certainly, when the County was able to locate all of those witnesses for trial, it cannot be said that it was laboring under any undue hardship in conducting whatever investigation it did conduct.

For these reasons we find no error in the refusal of the court below to grant the motion for judgment n.o.v.

The County has raised several additional issues relative to the trial court's charge to the jury. We have reviewed carefully the charge of the trial court in its entirety and find that it adequately covered all of the issues raised in the trial of this case.

The County further asserts that "During plaintiff's cross-examination, *he admitted at least twelve times* the complaint affidavit was not his." (Emphasis added). While there are indications in the record that Yurechko was confused regarding his signature on the verification of the complaint, such confusion did not constitute an "unequivocal, categorical, specific and unambiguous" denial that it was his signature that

appeared on the verification. Yurechko did admit that his name was spelled wrong and that he did not remember signing the verification but his failure of recollection hardly rises to the alleged twelve times repeated admission that "the complaint affidavit was not his".

The County next asks this Court to grant a new trial because the court allowed Yurechko's witness Roslund to give testimony as to the *general* condition of the road when he admittedly could not describe the *specific area* of the accident. The following testimony was elicited from this witness: "BY MR. SCHAUFFLER: Q. What did you observe in the middle of August, if anything, in the middle of August, 1959, concerning the makeup or the general way the road looked to you and felt to you? A. The road, the whole length of the road was—the berm—the edge of the road at the berm was broken off irregularly. I might say that was an almost standard condition for that road. And the resurfaces they put on kept cracking on the newest layer put on; break down old surface that had been covered over, and generally it was pitted and in some places had holes of considerable size. . . . Q. We are going to ask you if this does or does not concern the area of this accident which was near the bend of the road approximately 375 feet, 300 feet from the intersection of Simpson Hollow Road and there on; does it or does it not? A. Yes. Q. The resurfacing took place how frequently in this area at this time or any other time as far as resurfacing is concerned? A. There was no regular schedule. It might get a complete topping say three or five years apart. Patch crews would come through occasionally and put in cold patches, or sometimes in the summer hot patches."

A reading of the record indicates that this witness was obviously testifying as to the road condition in

the specific area of the accident. The County's argument in this respect lacks merit, especially in light of the fact that several defense witnesses referred to the general condition of the road with far less specificity than Roslund demonstrated.

During the cross-examination of Yurechko's witness, Twyla Bowers, the County asserts it was denied the right to cross-examination when the witness allegedly changed her testimony that "the only hole she saw was in the middle of the curve." In the first instance, the witness did not so testify; she related that, within a radius of 25 to 30 feet of the curve upon which the accident occurred, "Well, there was pot holes and that there. There were different size pot holes". On cross-examination, counsel for the County talked of *one* hole and tried to get the witness to give its exact location. The following colloquy took place: "A. It might have been directly in the middle, it might have been a little bit this way; it might have been a little bit that way but it was there. *There was a lot of pot holes there.* (Emphasis added). Q. Now, you have been very specific about a big hole that you showed us with your hands. Are you telling us—A. Like this here (indicating)—MR. SCHAUFFLER: If the Court please, she has marked this. It's in evidence. This is exactly where it is and he's back to the middle of the curve again. Do you mean the middle of the road? MR. GRIGSBY: Just a moment. If the Court please, I don't think it's for Mr. Schauffler to lead this witness in the course of my cross-examination and I object to it. MR. SCHAUFFLER: You seemed to be confused. THE COURT: I think we ought to drop the entire subject. I believe Mrs. Bowers had given you every explanation possible about a hole or holes and the condition of that road. I think it's up to the jury to evaluate her testimony. MR. GRIGSBY: All right,

sir. I will certainly abide by your instructions, your Honor. Can we approach the bench, your Honor?"

At this point, the County's counsel, after a short side bar conference, dropped the entire matter. It is obvious that the trial court was more than fair in allowing extensive and, in fact, repetitious cross-examination on the question of the existence of and location of the *pot holes* in the road, and the County's counsel's agreement to abide by the court's request that the subject be dropped with no objection raised to the trial court's ruling, precludes the County complaining of a fancied denial of the right of cross-examination. In the light of the record this contention borders on frivolity.

While it is apparent that the conduct of the trial was charged with an atmosphere of acrimony and hostility between opposing counsel, nevertheless, we find no errors in the record which would necessitate or justify the grant of a new trial.

Judgment affirmed.

Mr. Chief Justice BELL and Mr. Justice COHEN dissent.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.